IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 4, 2018

## IN RE FRANCIS R. ET AL

**Appeal from the Juvenile Court for Montgomery County**
**No. 17-JV-479, 17-JV-480, 17-JV-481   Tim Barnes, Judge**

_____

### No. M2018-00613-COA-R3-PT

_____

This is a parental termination case.  The juvenile court declined to terminate father's parental rights, but it found that clear and convincing evidence existed to terminate mother's on the grounds of abandonment by failure to provide a suitable home, persistence of conditions, substantial noncompliance with the permanency plan, and abandonment by willful failure to support.  The juvenile court further found that termination was in the best interests of the children.  We reverse as to the former two grounds, but affirm as to the latter two and further find that termination of mother's parental rights is in the best interests of the children.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in part, Reversed in Part, and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which ANDY D. BENNETT and THOMAS R. FRIERSON, II, JJ., joined.

Daniel P. Bryant, Clarksville, Tennessee, for the appellant, Tonya R.

Herbert H. Slatery, III, Attorney General and Reporter; and Jordan K. Crews, Assistant Attorney General, for appellee, Tennessee Department of Children's Services.

**OPINION**
**I. BACKGROUND AND PROCEDURAL HISTORY**

The children at issue in this case, F.R.J., B.J.J., and D.W.J. (collectively, "the Children"), were born to Tonya R. ("Mother") and Darrell J. ("Father").[1]  Mother and Father were never married but were living together throughout the majority of this case.

_____

[1] In cases involving minor children, it is this Court's policy to redact names sufficient to protect the children's identities.

On August 21, 2014, the Tennessee Department of Children's Services ("DCS") received a referral with allegations of drug exposure and lack of supervision at the home of Mother and Father. Child Protective Services Investigator Tamika Robinson responded to the referral and, with the intervention of law enforcement, entered and inspected the home where she observed "roaches, trash, and rotten food throughout the home." Mother voluntarily submitted to a drug screen and tested positive for opiates including Oxycodone. Mother could not provide prescriptions for the medications, admitting that she had a history of drug use. When Father returned to the home, he, too, submitted to a drug screen and tested positive for THC[2]. DCS attempted to find a safety-placement for the Children, but because none could be identified by the family, and due to the environmental neglect and drug exposure in the home, the Children were brought into DCS custody.

The next day, on August 22, 2014, DCS filed a petition in the Montgomery County Juvenile Court to adjudicate the Children dependent and neglected and for temporary legal custody. That same day, the juvenile court issued a protective custody order awarding temporary custody of the children to DCS. On October 13, 2014, the Children were placed with their paternal aunt and uncle in Elizabethtown, Kentucky. Subsequently, on July 2, 2015, the juvenile court issued an adjudicatory order, finding by clear and convincing evidence that the Children were dependent and neglected pursuant to Tennessee Code Annotated sections 37-1-102(b)(12)(F)-(G)[3] and that it was in the best interest of the Children to remain in the temporary custody of DCS.

At a July 16, 2015 permanency hearing, recognizing that Mother and Father had substantially completed all tasks requested by DCS and as required by certain permanency plans developed up to that date, the juvenile court granted the parents a ninety-day trial home placement beginning on or about July 25, 2015. The trial placement would expire at the end of the ninety days, thereby releasing the Children from DCS custody and restoring custody to Mother and Father. The trial home placement expired on October 30, 2015, and custody was restored to Mother and Father by order of the juvenile court on November 17, 2015.

On January 8, 2016, Child Protective Services Investigator Melanie Campbell, along with an officer with the Clarksville Police Department, made a visit to Mother and Father's home, but there was no answer. Ms. Campbell observed the outside of the home to be covered in trash. On January 27, 2016—only two months after Mother and Father regained custody of the Children—DCS received another referral alleging drug exposure at the home of Mother and Father. Later that month, Mother and Father met with Ms.

---

[2] THC is the psychoactive ingredient in marijuana.

[3] This statute has since been amended. The most recent version of this statute—and the sections cited by the juvenile court—can be found in Tennessee Code Annotated § 37-1-102(b)(13)(F)-(G).

Campbell at the DCS office. During the meeting, Mother admitted that on January 25, 2016, she had "chewed two Percocet." Mother also admitted that, since regaining custody of the Children, she had already relapsed twice and had quit attending therapy. Both Mother and Father submitted to a drug screen; Mother tested negative for all substances, but Father tested positive for THC.

The next month, on February 1, 2016, DCS developed a non-custodial permanency plan, requiring Mother and Father to, among other things: make themselves available for random drug screens; test negative for all substances unless prescribed; provide any prescription medication for pill counts; complete alcohol and drug counseling; submit a relapse prevention plan to DCS no later than March 1, 2016; maintain a clean home, ensuring it was free of insects; and address the Children's medical needs by scheduling appointments when necessary and attending the appointments. The plan also required Father to obtain a valid driver's license, and it required Mother to continue therapeutic services and to follow the program's recommendations.

On March 16, 2016, Ms. Campbell made an unannounced home visit and observed the home to be extremely messy and cluttered. Mother reported that she had been out of town in Tullahoma, Tennessee for about a month and that she had left the Children in Father's care. When Ms. Campbell asked about the home's conditions and discussed with Mother the possibility of seeking homemaker services, Mother stated that she knew how to clean and did not need such services. At a preliminary hearing on March 17, 2016, the juvenile court found probable cause to believe that the Children were dependent and neglected, granting DCS permission to implement an immediate protection agreement and ordering that the Children be placed in state custody if no placement could be found. DCS attempted to locate a safety-placement for the Children, but none could be identified by the family, who reported that all of their relatives lived outside of Tennessee.[4] Because no placement was available, coupled with the environmental neglect and drug exposure in the family home, the Children were brought into DCS custody on March 21, 2016. Then, on March 22, 2016, DCS filed a petition to adjudicate the Children dependent and neglected, citing to Mother's recurrent drug use and recent relapse,[5] the untidiness of the family home, Mother and Father's unhealthy relationship, and the prior custodial episode discussed above.[6]

---

[4] The paternal aunt and uncle in Elizabethtown, Kentucky, who had previously fostered the Children during the first custodial episode, indicated that they could not take the Children.

[5] DCS also alleged that Mother had missed her medication appointments and attended only one day of relapse prevention.

[6] An adjudicatory hearing was held on May 31, 2016, and, according to DCS, the juvenile court granted the petition and adjudicated the children dependent and neglected on August 12, 2016. This adjudication order, however, is not currently part of the appellate record. DCS states that, pursuant to

Multiple permanency plans were developed—one on April 7, 2016, and then another on October 28, 2016, both of which contained the same responsibilities. Subsequently, on March 22, 2017, DCS filed a petition in the Montgomery County Juvenile Court to terminate the parental rights of both Mother and Father, alleging four grounds for termination: abandonment by failure to support; abandonment by failure to provide a suitable home; substantial noncompliance with the permanency plans; and persistence of conditions. The juvenile court conducted a trial on the petition on September 26 and October 31, 2017, which revealed that Mother had not complied with her responsibilities under the permanency plans while Father had done so. According to Ms. Christian, the DCS caseworker for the family during the second custodial episode, Father completed his drug screens, maintained stable employment, paid child support, obtained a valid driver's license, participated in child and family team meetings, maintained appropriate and consistent visitation with the Children, and was compliant with DCS with whatever it asked him to do regarding the issue of improving the conditions of the home. In fact, Ms. Christian testified that the only barrier to Father's reunification with the Children was Mother's presence in the home.

At the close of the first day of trial, the juvenile court made initial oral findings but delayed a final ruling until a later date. As to the grounds against Mother, it found clear and convincing evidence of abandonment by willful failure to support and by failure to provide a suitable home, substantial noncompliance with the permanency plans, and persistence of conditions. It also found that Father had complied with his responsibilities under the permanency plans and that Mother was the only barrier to the Children's reunification with Father. Accordingly, it ruled that Mother vacate the home and that she and Father have no contact with one another. When the trial resumed, Father confirmed that Mother no longer lived in the home and that he had no direct or indirect contact with her. As such, the juvenile court declined to terminate Father's parental rights.

At the recommendation of DCS, the Children were placed in Father's home for a trial home visit on December 15, 2017. Afterwards, according to a March 1, 2018 DCS court report, the Children were attending Byrns Darden Elementary School and "doing very well." The report also stated that the children were receiving services through Health Connect, that Tennessee Voices was in the home to assist Father in behavioral issues and family routines, that Father continued to test negative on all drug screens, and that, after a successful ninety-day home trial visit, the Children should be released to Father's sole custody.

Tennessee Rule of Appellate Procedure 24(e), it filed a motion to supplement the record contemporaneously with the filing of its appellate brief. DCS claimed that a supplemental record including the adjudication order would be forthcoming, but, after our review of the record, we have discovered no such motion to supplement the record has ever been filed.

- 4 -

On March 27, 2018, the juvenile court terminated Mother's parental rights on the grounds of abandonment by willful failure to support, failure to provide a suitable home, substantial noncompliance with the permanency plans, and for persistence of conditions, and further finding that such termination was in the Children's best interest. Regarding Father, the juvenile court found that it was not in the Children's best interests for Father's rights to be terminated. Mother timely appealed.

## II. ISSUES PRESENTED

There are two dispositive issues on appeal, which we restate as follows:

1. Whether there is clear and convincing evidence to support at least one of the four grounds for termination of Mother's parental rights.
2. If so, whether there is clear and convincing evidence to support the juvenile court's determination that termination of Mother's parental rights is in the Children's best interests.

## III. STANDARD OF REVIEW

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (Tenn. 1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only when a compelling interest exists. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Accordingly, both the grounds for termination and that termination of parental rights is in the child's best interest must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140

- 5 -

S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.*

In view of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review in Tennessee Rule of Appellate Procedure 13(d). As to the juvenile court's findings of fact, our review is de novo with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the juvenile court, clearly and convincingly establish the elements necessary to terminate parental rights. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

## IV. GROUNDS FOR TERMINATION OF PARENTAL RIGHTS

As noted earlier, the juvenile court relied on four statutory grounds in terminating Mother's parental rights: (1) abandonment by willful failure to support; (2) abandonment by willful failure to establish a suitable home; (3) substantial noncompliance with the requirements of the permanency plan; and (4) persistence of the conditions that led to the children's removal from the home. Although only one ground must be proven by clear and convincing evidence in order to terminate a parent's rights, the Tennessee Supreme Court has instructed the appellate courts to review every ground relied upon by the juvenile court to terminate parental rights in order to prevent "unnecessary remands of cases." *In re Angela E.*, 303 S.W.3d 240, 251 n.14 (Tenn. 2010). Moreover, the Tennessee Supreme Court has also instructed the appellate courts to "review a trial court's findings regarding all grounds for termination and whether termination is in a child's best interests, even if a parent fails to challenge these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 511 (Tenn. 2016). Accordingly, we will review each of the foregoing grounds on which the juvenile court relied in terminating Mother's parental rights.

### A. Abandonment by Willful Failure to Support

Termination of a parent's rights may be initiated based on "[a]bandonment by the parent or guardian, as defined in § 36-1-102 . . . ." Tenn. Code Ann. § 36-1-113(g)(1). Tennessee Code Annotated section 36-1-102 outlines several definitions of "abandonment." As is relevant to this ground, the statute provides that "abandonment" means:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent[s] . . . of the child who is the subject of the petition for termination of parental rights or adoption, that the parent[s] . . . have failed to support or have failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i).[7]  Here, DCS filed the termination petition on March 22, 2017.  Accordingly, we look to the four-month period immediately preceding this date.

Parents who are eighteen years of age or older are presumed to be aware of their duty to support their children.  *See* Tenn. Code Ann. § 36-1-102(1)(H).  Moreover, "the obligation to pay support exists even in the absence of a court order to do so."  *In re Michaela V.*, No. E2013-00500-COA-R3-PT, 2013 WL 6096367, at *8 (Tenn. Ct. App. Nov. 19, 2013).  For purposes of this ground, Tennessee Code Annotated section 36-1-102(1)(D) defines "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" as "the willful failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child."  Tenn. Code Ann. § 36-1-102(1)(D).[8] The statute defines "token support" as support that, "under the circumstances of the individual case, is insignificant given the parent's means."  Tenn. Code Ann. § 36-1-102(1)(B).[9]  Additionally, concerning the statutory requirements that a parent's failure to support must be willful, this Court discussed that criterion as follows:

> The concept of "willfulness" is at the core of the statutory definition of abandonment.  A parent cannot be found to have abandoned a child . . . unless the parent has . . . "willfully" . . . failed to support the child for a period of four consecutive months. . . .   In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code.  Nor does it require malevolence or ill will.  Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent.  Conduct is "willful" if it is the product of free will rather than coercion.  Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.
> . . . .
> The willfulness of particular conduct depends upon the actor's intent.  Intent is seldom capable of direct proof, and triers-of-fact lack the ability to

---

[7] This statute has been amended since the March 27, 2018 order; however, this particular provision remained unchanged.

[8] This statute has been amended since the March 27, 2018 order to include the following language at the end of the subsection: "That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period."  Tenn. Code Ann. § 36-1-102(1)(D) (2018).  This language, however, does not affect the application of the statute as quoted by the juvenile court.

[9] This statute has been amended since the March 27, 2018 order; however, this particular provision remained unchanged.

peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*In re Audrey S.*, 182 S.W.3d 838, 863-64 (Tenn. Ct. App. 2005) (internal citations and footnotes omitted). "Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. Ct. App. 2013). Furthermore, as this Court recently explained:

> It is axiomatic that "in order to establish the ground of abandonment by willful failure to support by clear and convincing evidence, the party seeking termination must generally 'submit . . . evidence regarding [the parent's] employment, income, [or] other non-monetary assets' as well as the parent's 'expenses during the four-month period.'" *In re Michael B.*, No. M2015-02497-COA-R3-PT, 2016 WL 7486361, at *11 (Tenn. Ct. App. Oct. 6, 2016) (quoting *In re Destiny H.*, No. W2015-00649-COA-R3-PT, 2016 WL 722143, at *9 (Tenn. Ct. App. Feb. 24, 2016)). Such evidence need not be an accounting of every dollar earned and spent, and it need not even be tied to dollars and cents, but it must be clear and convincing evidence that the parent had the capacity to pay support, did not do so, and had no justification for not doing so.

*In re Preston L.*, No. M2016-02338-COA-R3-PT, 2017 WL 4315356, at *5 (Tenn. Ct. App. Sept. 27, 2017).

In its order terminating her parental rights, the juvenile court found, in relevant part, that

> in the four months prior to the filing of this petition . . . [Mother] made no payments at all. The proof showed that [Mother] was ordered to pay $50 per month per child. She paid nothing. [Father] did pay support for his children. In fact, the proof was that [Father] paid more than he was ordered to pay. The Court would find that there is no excuse given by [Mother] as to why she did not pay any support. There was no testimony by [Mother] or DCS that [Mother] was incarcerated or hospitalizations or any medical reason that would prevent her from paying child support. In fact, the testimony by [Mother] was that she smoke[s] cigarettes and that she finds money to continue to support her drug habit. The court would therefore find, she is able-bodied and capable of gainful employment and to pay child support for her children and her failure to do so is willful.

. . . [Mother] was aware of her obligation to support her child, knew that it was a ground to terminate her parental rights, and still willfully failed to support her children. The Court finds by clear and convincing evidence that [Mother] failed to pay for the children during the statutory period, and therefore, grants the termination of [Mother's] parental rights based on this ground.

The record supports the juvenile court's findings. As to Mother's failure to pay any child support, Ms. Christian provided the following testimony:

Q: And so the four months leading up to the filing of this petition, between . . . November 22, 2016, and March 22, 2017, there were no child support payments whatsoever made by [Mother]?
A: No, ma'am.
Q: To your knowledge, is there any reason why [Mother] cannot work?
A: No. There was a period where she did seek employment, and it didn't last for a couple of reasons, from my understanding.
. . . .
Q: Has [Mother] ever been incarcerated or hospitalized during that four-month period, to your knowledge, between November 22, 2016, and March 22, 2017?
A: No.
. . . .
Q: . . . I believe you testified that you believe that [Mother] is capable of gaining employment. You don't know of any disability that she has?
A: Not to my knowledge.
Q: She's not receiving any kind of disability payments?
A: Not to my knowledge, no, ma'am.

Further, when Mother was asked whether she had sought any work since the Children were brought into state custody, Mother replied that she had, but that her "main focus is a job within itself, which has been [drug] recovery." When Mother was asked about Father's continuous payment of child support, the following exchange took place:

Q: And as far as child support goes, [Father] was paying child support, correct?
A: Yes, sir.
Q: And you-all are living together as a couple; is that right?
A: Yes, sir.
Q: Did you feel like the two of you were paying that together?
A: I can't speak for him on behalf of something I didn't choose to do. I can say that I should have, and, you know, there's no excuse for that[.]

Accordingly, based on the above testimonies, including Mother's admission that she willfully chose not to pay child support—again, for which she noted there was "no excuse"—there is no evidence to suggest that Mother had any justification or infirmity, other than her drug addiction, to preclude her from obtaining gainful employment and paying child support. Rather, the evidence suggests that Mother failed to pay $50 a month for each of the Children yet somehow found money to support her drug addiction, despite her refusal to seek gainful employment. This Court has found that willful unemployment can equate to a willful failure to support. *See In re Austin D.*, No. E2012-00579-COA-R3-PT, 2013 WL 357605, at *11-12 (Tenn. Ct. App. Jan. 30, 2013) (mother's personal choice not to work contributed to the conclusion that she willfully failed to pay child support). From the totality of the circumstances, we conclude that there is clear and convincing evidence to support the juvenile court's termination of Mother's parental rights on the ground of abandonment by willful failure to support.

### B. Abandonment by Willful Failure to Provide a Suitable Home

Additionally, the juvenile court found that Mother abandoned the Children by her failure to provide a suitable home. "An essential element of this ground for termination is proof that '[t]he child has been removed from the home of the parent[s] . . . as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department . . . .'" *In re Aiden R.*, No. E2015-01799-COA-R3-PT, 2016 WL 3564313, at *7 (Tenn. Ct. App. June 23, 2016) (quoting Tenn. Code Ann. § 37-1-102(1)(A)(ii)). "[T]he mere suggestion or possibility of an order adjudicating the child dependent and neglected is not good enough." *In re R.L.M.*, No. E2013-02723-COA-R3-PT, 2015 WL 389635, at *3 (Tenn. Ct. App. Jan. 29, 2015).

Here, DCS concedes on appeal that "[t]he order adjudicating the children dependent and neglected was entered on August 12, 2016 but is not currently part of the appellate record." Although the record does contain the March 22, 2016 preliminary hearing order finding probable cause that the Children were dependent and neglected and removing the Children from the home, it contains no order expressly adjudicating the Children dependent and neglected. *See In re Audrey S.*, 182 S.W.3d at 875 ("The temporary custody order contains an implicit judicial finding of probable cause that Audrey S. was dependent, neglected, or abused. It does not contain a finding, either explicit or implicit, that Audrey S. was in fact dependent, neglected, or abused."). DCS states that, pursuant to Tennessee Rule of Appellate Procedure 24(e), it filed a motion to supplement the record with the adjudicatory order contemporaneously with the filing of its brief. However, a thorough search of the appellate record has not revealed either the motion or the order allowing supplementation of the record. Accordingly, the record currently before this court does not support the juvenile court's termination of Mother's parental rights on the ground of abandonment by willful failure to provide a suitable home and we, therefore, reverse on this ground.

- 10 -

## C. Substantial Noncompliance with Permanency Plan

The juvenile court also based its termination of Mother's parental rights on substantial noncompliance with the permanency plans established for her by DCS. Tennessee Code Annotated section 36-1-113(g)(2) provides that grounds for termination may exist when "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan . . . ." As this Court has previously explained:

> Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn. Code Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance.

*In re M.J.B.*, 140 S.W.3d at 656–57 (internal citations omitted). Additionally, because determining whether substantial noncompliance exists is a question of law, we review the issue de novo with no presumption of correctness. *In re Valentine*, 79 S.W.3d at 548.

As noted above, on April 7, 2016, DCS, Mother, and Father participated in the development of the initial permanency plan. Under the plan, Mother's responsibilities were as follows: make monthly child support payments of $50.00 for each child; give at least 24 hours' notice to cancel or reschedule a visit from DCS; participate in homemaker services; ensure that the house was kept clean and free of clutter; have the family home sprayed for roach infestation; have a legal means—either through employment or other government agencies—to support the Children; make herself available for random drug screens; provide any medication prescribed for pill counts and test negative for all substances except those prescribed; complete alcohol and drug treatment to determine any addictions; avoid using illegal substances around the Children; and participate and complete an impatient treatment program, which she was to continue until all treatment goals were met, following all of the recommendations made by the program. The permanency plan was revised on October 28, 2016. Mother's requirements under this subsequent plan remained unchanged, and Ms. Christian spoke with both Mother and Father to ensure that they understood the criteria contained therein.

It is undisputed that the primary reasons for the Children's removal from Mother's custody were environmental neglect and Mother's drug use. In ratifying the foregoing

permanency plans, the juvenile court held that the requirements under the permanency plans were clearly reasonable and related to remedying the conditions that warranted the Children's removal. Concerning Mother's lack of compliance with the most pressing requirement of the permanency plan—to be drug free—the juvenile court found that

> [Mother] has not maintained her sobriety nor has she complied with treatment recommendations. She has relapsed multiple times during this custodial episode, and after her relapse, has continued to test positive for non-prescribed drugs. She admitted to daily use of methamphetamine during her most recent assessment. She has been recommended to complete inpatient treatment for substance abuse and demonstrated a need for a higher level of care, but has not complied with the treatment recommendations. She was unsuccessfully discharged from an outpatient treatment program. She was ordered to have regular visitations with the children, but has missed scheduled visitations. Her excuse, by her own admission through her testimony, for missing those visitations was that she was on drugs[.]

As to Mother's other responsibilities in the plans, the juvenile court found that Mother "has not obtained a source of income, nor has she paid support" and that "[s]he has not consistently maintained the home environment or effectively co-parented with [Father]." The record supports the juvenile court's findings. Ms. Christian testified that, during the four-month period following the date the three children were brought into DCS custody, March 21, 2016 to July 16, 2016, DCS attempted to assist Mother and Father toward reunification. For example, Ms. Christian testified that, during this period, she conducted a walk-through of the family home, requested funding for Mother's alcohol and drug assessments should Mother need it, put in multiple referrals to exterminator and homemaker services, and explained that a safe and stable home was necessary for the Children' return to the home. Ms. Christian also testified, however, that Mother did not participate in homemaker services, failed to pay any child support, and did not have a job or a legal means of income, despite the fact that there appeared to be no reason that she could not work. More significantly—and as stated in the above section—since the first custodial episode in 2014, Mother failed to maintain sobriety and continued to test positive for illegal substances, including methamphetamine and benzodiazepines. Ms. Christian testified that Mother also failed to provide all of her prescription medications for pill counts and, after her most recent relapse, did not successfully complete the alcohol and drug assessment recommendations. As to the supervised visitations with the Children, Ms. Christian testified that Mother did not attend all such visits, which, according to Mother, was because she "was in active use."[10] Based on our review of the

---

[10] As to when she stopped visiting her Children, Mother testified: "[E]very visit that has ever been given or every visit that we've ever had with the children was together until my [conscience] told me that I cannot be around my children high."

- 12 -

record in this case, we conclude that there is clear and convincing evidence to support the juvenile court's termination of Mother's parental rights on the ground of substantial noncompliance with the permanency plan.

## D. Persistence of Conditions

The juvenile court also relied on Tennessee Code Annotated section 36-1-113(g)(3) as a ground for terminating Mother's parental rights. The statutory ground of persistence of conditions "applies as a ground for termination of parental rights only where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *In re Audrey S.*, 182 S.W.3d at 874. In *In re Audrey S.*, recognizing that a court order changing or awarding custody of a minor child does not necessarily imply a finding of dependency, neglect, or abuse, this Court determined that an order changing custody was insufficient to support a finding of persistent conditions because it did not contain an explicit or implicit finding that the child was dependent, neglected, or abused. *See id.* at 875-76. Since the *In re Audrey S.* decision, this Court has consistently held that a court order adjudicating the child or children to be dependent, neglected, or abused is required to terminate a parent's rights on the statutory ground of persistence of conditions. *See, e.g., State of Tenn., Dep't of Children's Servs. v. Hood*, 338 S.W.3d 917, 928 (Tenn. Ct. App. 2009) ("Because there was never a judicial finding of dependency, neglect or abuse, based on clear and convincing evidence, persistence of conditions under Tenn. Code Ann. § 36–1–113(g) cannot be a ground for termination of parental rights."); *In re Aiden R.*, 2016 WL 3564313, at \*9 ("An essential prerequisite to establishing persistence of conditions is evidence of a 'prior court order removing the child from the parent's home . . . based on a judicial finding of dependency, neglect or abuse.'").

As in *In re Audrey S.*, the appellate record before us does not contain a court order removing the Children from Mother's custody based on a finding of dependency, neglect, or abuse as required by Tennessee Code Annotated section 36-1-113(g)(3). We conclude, therefore, that, in the absence of such a court order, there is not clear and convincing evidence to support the juvenile court's termination of Mother's parental rights on this ground and we, therefore, reverse this ground for termination.

## V. BEST INTERESTS

Having found at least one statutory ground on which to sustain termination of Mother's parental rights, we must now consider whether the petitioner has proven by clear and convincing evidence that termination of Mother's parental rights is in the Children's best interests. *See* Tenn. Code Ann. § 36-1-113(c)(2). Once the court has determined that the parent is unfit based on clear and convincing evidence that one or more of the grounds for termination exists, the interests of the parent and child diverge, and the interests of the child become the court's paramount consideration. *In re Audrey*

*S.*, 182 S.W.3d at 877. If the interests of the parent and the child conflict, the court must always resolve the conflict in favor of the rights and best interests of the child. Tenn. Code Ann. § 36-1-101(d). Tennessee Code Annotated section 36-1-113(i) sets forth the following list of factors to be considered when determining a child's best interests in a termination of parental rights case:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).[11]

Addressing each of the nine factors listed above, Mother argues that the record does not contain clear and convincing evidence that terminating her parental rights would be in the Children's best interests. Although courts should consider the factors listed

---

[11] This statute has been amended since the March 27, 2018 order; however, this particular provision remained unchanged.

in Section 36–1–113(i) to the extent that they are relevant to the particular facts and circumstances of the case, the list is "not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.,* 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of the case, the consideration of a single factor, or of facts outside the statutory factors, may dictate the outcome of the court's analysis. *In re Audrey S.,* 182 S.W.3d at 878. Pertaining to the juvenile court's conclusion, Mother argues that she completed inpatient rehab in February 2017 and that there was no evidence of relapse since. This contention, however, fails to address the proof offered by Ms. Christian that, from November 21, 2016 to March 21, 2017, Mother tested positive on multiple drug screens for methamphetamines and benzodiazepines. Accordingly, we conclude that the juvenile court appropriately considered the overall circumstances in making the best interests determination. As the juvenile court noted, Mother put minimal effort into improving her circumstances following the Children's removal and has not demonstrated that she has become any more capable of providing the Children with a safe and stable home. In light of the foregoing, we are satisfied that the record contains clear and convincing evidence that terminating Mother's parental rights is in the Children's best interests.

## VI. CONCLUSION

For the foregoing reasons, although we reverse the juvenile court's order with respect to the grounds of abandonment by failure to provide a suitable home and persistence of conditions, we conclude that clear and convincing evidence supports the remaining grounds—abandonment by failure to provide child support and substantial noncompliance with the permanency plans—for terminating Mother's parental rights and we further conclude that clear and convincing evidence supports the juvenile court's determination that termination of Mother's parental rights to F.R.J., B.J.J., and D.W.J. is in the Children's best interests.

_____
ARNOLD B. GOLDIN, JUDGE